In the Matter of the Estate of THOMAS M. BETZ, Deceased. ANGELA M. BURNSIDE, as Guardian of JACOB T. BURNSIDE, an Infant, Appellant; MARGERET M. BETZ, as Administrator of the Estate of THOMAS M. BETZ, Deceased, Respondent. ROBERT F. MCCARTHY, as Guardian ad Litem of JACOB T. BURNSIDE, an Infant, Respondent. [903 NYS2d 557]—

Peters, J. Appeal from an order of the Surrogate's Court of Albany County (Doyle, S.), entered October 7, 2009, which denied petitioner's motion for a genetic marker test and to vacate a prior order appointing a guardian ad litem for Jacob T. Burnside.

Decedent died in November 2007 after being struck by a vehicle in the City of Albany. Respondent, decedent's mother, thereafter applied for and was granted limited letters of administration. In her petition, respondent averred that decedent had no children and identified herself as decedent's sole distributee. In 2008, Surrogate's Court approved a $50,000 settlement for respondent's cause of action for decedent's wrongful death and discontinued the claim for conscious pain and suffering.

In April 2009, petitioner was appointed as guardian of the person and property of her infant son, Jacob T. Burnside (born in 1995). She thereafter commenced this proceeding seeking,

among other things, a compulsory accounting of decedent's estate and a declaration that Jacob is the biological child of decedent and a distributee of his estate. After settlement discussions between the parties proved fruitless, Surrogate's Court ordered, sua sponte, the appointment of Robert F. McCarthy as guardian ad litem to represent Jacob's interests. Petitioner moved to vacate the order appointing McCarthy and sought a genetic marker test to be conducted on the remains of decedent, which were being held by the coroner's physician, to establish the paternity of Jacob. Surrogate's Court denied the motion, finding that its appointment of McCarthy was proper and concluding that petitioner's request for a genetic marker test was "premature and without legal basis." This appeal by petitioner ensued.

Petitioner asserts that Surrogate's Court abused its discretion in declining to vacate its prior order appointing McCarthy as guardian ad litem. A court is permitted to appoint a guardian ad litem to appear for an infant, even where the infant has another representative, where possible adversity or a conflict of interest exists, or for other cause (see SCPA 402 [2]; see also CPLR 1201). Here, Surrogate's Court found a direct conflict of interest between petitioner and Jacob, and that petitioner's counsel's misunderstanding of SCPA article 4, coupled with his litigiousness, caused a "strong potential for a negative outcome" and a high probability of conflict with Jacob's best interests. We address these findings in turn.

Surrogate's Court's determination that a direct conflict of interest existed between petitioner and Jacob—based on the parties' status in this proceeding, petitioner's possible "abandonment" of decedent and the potential effect this may have on the ultimate distribution of any wrongful death proceeds—lacks any factual or legal support. Simply stated, petitioner has no pecuniary interest in this proceeding or the underlying wrongful death action. She was never the spouse of decedent and is not a distributee of his estate, intestate or by testamentary substitute. Moreover, despite Surrogate's Court's suggestion to the contrary, any alleged abandonment of decedent by petitioner is wholly irrelevant to the distribution of wrongful death proceeds inasmuch as the parties were never married (see EPTL 5-1.2 [a] [5]). Clearly, petitioner has no pecuniary interest that may be deemed adverse to that of Jacob (compare Alcantara v Mendez, 303 AD2d 337, 338 [2003]; Matter of Holquin, 101 Misc 2d 174, 180 n [1979]).

Nor do we agree that the error by petitioner's counsel in initially naming and referring to Jacob as the petitioner in this

proceeding demonstrates such a misunderstanding of the SCPA as to warrant an appointment of a guardian ad litem. While a court can properly consider counsel's skill, experience and familiarity with the relevant law in determining whether to appoint a guardian ad litem (*see e.g. Matter of Lockwood*, 309 AD2d 708, 709 [2003], *lv denied* 2 NY3d 708 [2004]), a review of counsel's legal arguments both before Surrogate's Court and on this appeal clearly reveals that counsel has a sufficient grasp on the applicable law, despite his initial misstep.

Surrogate's Court's further finding—that, based on petitioner's refusal to consent to respondent's settlement offer of $5,000 and its own assessment of the merits of the case, counsel's litigiousness had a "strong potential for a negative outcome" and had a high probability of being in conflict with Jacob's best interests—is likewise flawed. To the contrary, the record reflects that petitioner's refusal to accept the settlement offered by respondent was based upon an informed and reasonable judgment that the offer was not in Jacob's best interests. "Where, as here, 'reasonable minds may legitimately differ, the judgment of the infant's natural guardian[ ] should prevail' " (*Matter of Palmiere*, 284 AD2d 965, 966 [2001], *lv denied* 97 NY2d 601 [2001], quoting *Stahl v Rhee*, 220 AD2d 39, 46 [1996]). Petitioner reasoned that the $5,000 settlement offer was "inadequate and unjust" because respondent was unjustly enriched by $50,000 inasmuch as Jacob, rather than respondent, should have been the sole distributee of decedent's estate. Further, there is nothing to suggest that petitioner is unwilling to accept a reasonable settlement offer; indeed, petitioner's offer to settle the action for $25,000 was rejected by respondent.

Moreover, while petitioner's success in the wrongful death action may not be assured, we do not agree with Surrogate's Court's assessment that there is a "strong potential for a negative outcome" in the event that the matter presses forward. If petitioner can establish that Jacob is decedent's child—which, as more fully discussed below, finds support in the record—she would then be required to void the previous decree of judicial settlement by which respondent received the $50,000 in insurance proceeds. In that regard, case law strongly supports an argument in favor of vacatur of that settlement, on the basis that respondent was ineligible to receive letters of administration and commence the wrongful death claim in the first instance (*see Hernandez v New York City Health & Hosps. Corp.*, 78 NY2d 687, 692-693 [1991]). For these reasons, it cannot be said that petitioner's judgment in this matter has been unreasonable or contrary to Jacob's best interests (*see Stahl v Rhee*,

220 AD2d at 45-46; *see also Sutherland v City of New York*, 107 AD2d 568, 568-569 [1985], *affd* 66 NY2d 800 [1985]). Having found no basis to conclude that petitioner's interests are adverse to those of Jacob or that petitioner is otherwise not acting in accordance with the best interests of her child, and mindful of this state's policy "to encourage parents to act as guardians, thereby avoiding unnecessary appointments and the expense of a guardian ad litem" (*Matter of Manufacturers Hanover Trust Co.*, 83 AD2d 808, 808 [1981]; *see Matter of Palmiere*, 284 AD2d at 965; *Stahl v Rhee*, 220 AD2d at 44-46), we conclude that the order appointing McCarthy must be vacated.

We next address petitioner's assertion that Surrogate's Court improperly denied her pretrial request for genetic marker testing. At the time relevant to this proceeding, EPTL 4-1.2 provided that "[a] non-marital child is the legitimate child of his father so that he and his issue inherit from his father and his paternal kindred if . . . paternity has been established by clear and convincing evidence and the father of the child has openly and notoriously acknowledged the child as his own" (EPTL 4-1.2 [a] [2] [former (C)]).[1] While the statute clearly sets forth the standard of proof applicable to determining the ultimate issue of paternity, it does not establish the burden to be imposed upon a party seeking a pretrial order for posthumous genetic marker testing.

Nor has this Court addressed the issue. In *Matter of Poldrugovaz* (50 AD3d 117, 118 [2008]), the Second Department concluded that "a court may grant a pretrial motion for posthumous genetic marker testing when the applicant provides *some evidence* that decedent openly and notoriously acknowledged the nonmarital child as his own, and establishes that genetic marker testing is reasonable and practicable under the totality

---

1. EPTL 4-1.2 (a) (2) (C) was recently amended to provide that a nonmarital child is the legitimate child of his father if "paternity has been established by clear and convincing evidence, which may include, but is not limited to: (i) evidence derived from a genetic marker test, or (ii) evidence that the father openly and notoriously acknowledged the child as his own." Inasmuch as the amendment applies to the estates of decedents who died on or after its April 28, 2010 effective date (*see* L 2010, ch 64, § 4), it has no application to the facts of this case. Accordingly, in determining the appropriate showing that petitioner must make here on her application for a pretrial order for genetic marker testing, our analysis must be guided by the standard of proof imposed by EPTL 4-1.2 (a) (2) (former [C])—the law as it existed at the time of decedent's death. We caution that, because the statute was changed so dramatically, this decision should not be read to apply to requests for pretrial genetic marker testing involving estates of decedents who died after the amendment's effective date. To that end, we express no opinion as to the appropriate standard to be applied under EPTL 4-1.2 (a) (2) (C) as amended.

of the circumstances" (emphasis added). The court also set forth certain factors to be considered in determining whether it is reasonable and practicable to order DNA testing, including, but not limited to, "(1) whether evidence presented demonstrates a reasonable possibility that the genetic testing will establish a match; (2) the practicability of obtaining the tissue sample for the purpose of conducting the genetic testing, including whether the sample is readily available; (3) whether there is a need to exhume the decedent's body or obtain the sample from a nonparty; (4) whether appropriate safeguards were, or will be, taken to insure the reliability of the genetic material to be tested; and (5) the privacy and religious concerns of the decedent and or his family members" (*id.* at 129). Recognizing the usefulness and reliability of genetic marker evidence and the "steadily consistent trend to enhance the ability of nonmarital children to assert rights of inheritance such that they should be treated in pari materia with marital children" (*id.* at 123-124), the *Poldrugovaz* court found that "[t]his standard strikes the appropriate balance between and among the state interest in timely, just, and orderly estate administration, respect for the privacy interests of the decedent and his family, and the right of a nonmarital child to material and relevant evidence available to establish paternity by clear and convincing proof" (*id.* at 129; *see* Turano, 2008 Supp Practice Commentaries, McKinney's Cons Laws of NY, Book 17B, EPTL 4-1.2, 2010 Pocket Part, at 156-157; Turano, 2006 Supp Practice Commentaries, McKinney's Cons Laws of NY, Book 17B, EPTL 4-1.2, 2010 Pocket Part, at 158). The thoroughness and sound reasoning of the Second Department's decision in *Poldrugovaz* persuades us to follow the standard set forth therein.[2]

Reviewing petitioner's submissions in light of this standard, we find that the several pictures of decedent with Jacob and the affidavits submitted in support of the motion provide some evidence that decedent openly and notoriously acknowledged that Jacob was his child (*see Matter of Poldrugovaz*, 50 AD3d at 130; *Matter of Wilkins*, 180 Misc 2d 568, 569-571 [1999]). Furthermore, the proof submitted on the motion established that

2. In following the standard articulated in *Poldrugovaz*, we necessarily reject the Fourth Department's view that a party seeking pretrial DNA testing need not first demonstrate that decedent openly and notoriously acknowledged paternity (*see Matter of Morningstar*, 17 AD3d 1060, 1060-1061 [2005]). Such a standard essentially "invit[es] the whole hopeful world to jump into the fray" without imposing any burden upon the applicant, which, in our view, is at odds with the intent of the Legislature in enacting EPTL 4-1.2 (Turano, 2006 Supp Practice Commentaries, McKinney's Cons Laws of NY, Book 17B, EPTL 4-1.2, 2010 Pocket Part, at 158).

petitioner's request for posthumous DNA testing of decedent's tissue samples was "reasonable and practicable" under the totality of the circumstances. The photographs of decedent and Jacob, coupled with the evidence that decedent acknowledged paternity, demonstrates a reasonable probability that testing will establish a match. Significantly, the tissue specimens are readily available for testing, having been secured by the coroner's physician, and will not require the exhumation of decedent's body or the taking of a specimen from a nonparty. Under these circumstances, petitioner's motion for pretrial DNA testing should have been granted (see *Matter of Poldrugovaz*, 50 AD3d at 131).

Cardona, P.J., Mercure, Kavanagh and Garry, JJ., concur. Ordered that the order is reversed, on the law, with costs, and motion granted.