Matter of McGuire (2025 NY Slip Op 04398)

Matter of Mcguire

2025 NY Slip Op 04398

Decided on July 25, 2025

Appellate Division, Fourth Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided on July 25, 2025
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Fourth Judicial Department

PRESENT: LINDLEY, J.P., CURRAN, SMITH, AND HANNAH, JJ.

542 CA 24-01515

[*1]IN THE MATTER OF THE ESTATE OF FRANCIS J. MCGUIRE, ALSO KNOWN AS FRANK J. MCGUIRE, DECEASED. —————————————————————————— JORDAN A. TRIPI, PETITIONER-RESPONDENT; JEANNE MARIE MCGUIRE, MICHAEL J. MCGUIRE, KATHLEEN MCGUIRE, F. JAMES MCGUIRE, KELLY MCGUIRE AND JACQUELYN MCGUIRE GURNEY, RESPONDENTS-APPELLANTS. (APPEAL NO. 2.) 

MAGAVERN MAGAVERN GRIMM LLP, BUFFALO (EDWARD J. MARKARIAN OF COUNSEL), FOR RESPONDENTS-APPELLANTS JEANNE MARIE MCGUIRE AND MICHAEL J. MCGUIRE.
LIPPES MATHIAS, LLP, BUFFALO (COURTNEY J. DONAHUE TASNER OF COUNSEL), FOR RESPONDENT-APPELLANT KATHLEEN MCGUIRE.
COLE, SORRENTINO, HURLEY, HEWNER AND GAMBINO, P.C., BUFFALO (THOMAS F. HEWNER OF COUNSEL), FOR RESPONDENTS-APPELLANTS F. JAMES MCGUIRE, KELLY MCGUIRE AND JACQUELYN MCGUIRE GURNEY.
DAN CHIACCHIA ATTORNEYS, PLLC, HAMBURG (TIFFANY M. KOPACZ OF COUNSEL), FOR PETITIONER-RESPONDENT. 

 Appeals from an order of the Surrogate's Court, Erie County (Acea M. Mosey, S.), entered July 30, 2024. The order, inter alia, granted the motions of respondents insofar as they sought leave to renew and reargue and, upon renewal and reargument, adhered to a prior determination granting petitioner's application to the extent it sought to compel nonconsensual DNA testing of a child of decedent. 
It is hereby ORDERED that the order so appealed from is unanimously affirmed without costs.
Memorandum: Francis J. McGuire (decedent) died on July 7, 2020. He was survived by, inter alia, seven known children, six of whom—respondents in this proceeding pursuant to SCPA 1809—are biologically related to him. At the time of his death, decedent had a will. The will contained no specific bequests to his children. Instead of any specific bequests, decedent left respondents the family business, inter alia, which passed outside of the will. In March 2021, Surrogate's Court issued a decree granting probate of decedent's will, and issued letters testamentary to the executors of the estate. All respondents except for one waived process and consented to probate of the will.
In January 2023, petitioner in this proceeding filed a notice of claim pursuant to SCPA 1803 with the Surrogate, alleging that she was one of decedent's biological children and, consequently, that she was a distributee and beneficiary of decedent's estate. As a result, she asserted a right, as a possible distributee and beneficiary, to participate in and object to the underlying probate proceeding and to request a construction hearing with respect to decedent's will. Petitioner alleged that she was decedent's biological child on the basis that her mother had an affair with decedent around the time petitioner was conceived. Petitioner first discovered that decedent might be her biological father when, in 2021, she submitted her own biological samples to an online ancestry company while researching her family background. Although petitioner's mother initially denied that decedent was petitioner's biological father, she eventually admitted [*2]her prior affair with decedent to petitioner, and suggested that it was possible that he could be her biological father.
When decedent's estate failed to acknowledge petitioner's notice of claim, petitioner sought, by order to show cause, to compel, pursuant to SCPA 1809, a known child of decedent's—i.e., one of respondents—to submit to DNA testing to confirm petitioner's parentage. All respondents, except respondent Kelly McGuire, opposed the relief requested by petitioner, arguing, among other things, that the Surrogate lacked the authority to issue the requested relief, that DNA testing was unnecessary where, as here, there was essentially no way for petitioner to inherit from decedent's estate, and that the requested relief was not appropriate inasmuch as respondents' privacy interests outweighed petitioner's interest in ascertaining her true parentage. In appeal No. 1, respondents—except for respondent
Michael J. McGuire—appeal from an order granting petitioner's application to the extent it sought to compel nonconsensual DNA testing of one of respondents to confirm whether decedent is petitioner's biological father.
Subsequently, all respondents moved to preclude any of the DNA testing requested by petitioner, and for leave to reargue and renew the Surrogate's order granting petitioner's application for DNA testing. Petitioner opposed respondents' motions. In appeal No. 2, respondents appeal from an order that granted their motions insofar as they sought leave to renew and reargue petitioner's application for DNA testing and, upon renewal and reargument, adhered to the prior determination granting petitioner's request, and denied respondents' motions insofar as they sought to preclude any DNA testing of them.
Initially, inasmuch as the Surrogate granted those parts of respondents' motions seeking leave to renew and reargue petitioner's application, we conclude that the appeals from the order in appeal No. 1 should be dismissed inasmuch as the order in appeal No. 2, which was entered upon renewal and reargument, supersedes the order in appeal No. 1 (see Loafin' Tree Rest. v Pardi [appeal No. 1], 162 AD2d 985, 985 [4th Dept 1990]).
In appeal No. 2, respondents contend that the Surrogate erred in ordering the nonconsensual testing of their DNA on the basis that she lacked the statutory power to authorize such relief. We reject that contention. In granting petitioner relief, the Surrogate relied on EPTL former 4-1.2 (a) (2) (C)—i.e., the version of that section of the statute applicable at the time of decedent's death in 2020—to authorize the nonconsensual testing of respondents' DNA to confirm petitioner's parentage. That provision, governing inheritance by nonmarital children, provided, in relevant part, that "[a] non-marital child is the legitimate child of [their] father so that [they] and [their] issue inherit from [their] father and [their] paternal kindred if . . . paternity has been established by clear and convincing evidence, which may include, but is not limited to . . . evidence derived from a genetic marker test, or . . . evidence that the father openly and notoriously acknowledged the child as [their] own" (id. [emphasis added]). On its face, the plain language of that provision supports the assertion that petitioner here could seek to establish her parentage through resort to DNA testing. There is no dispute that decedent did not know that petitioner was his child, and therefore there can be no evidence of decedent openly and notoriously acknowledging her as one of his children. Thus, resort to DNA testing under EPTL former 4-1.2 (a) (2) (C) was effectively the only way petitioner could establish that she was a nonmarital child of decedent. If petitioner could establish that she was decedent's biological child and, consequently, that she had a right to inherit from him as a nonmarital child, then she would be a distributee and a necessary party to the probate proceeding, and would also have standing to challenge the will (see SCPA 1403 [1] [a]; see also Matter of American Comm. for Weizmann Inst. of Science v Dunn, 10 NY3d 82, 95 [2008]; see generally SCPA 1410).
Respondents contend, however, that the Surrogate erred in relying on EPTL former 4-1.2 (a) (2) (C) to grant the requested relief inasmuch as that provision applied only in cases involving intestate succession, and not where, as here, decedent died with a will. We reject that contention. Respondents' argument in that regard hinges on the fact that EPTL 4-1.2, in both its former and current forms, is found in the article of the EPTL that governs intestate succession. Thus, the argument goes, its application is limited to only those circumstances, and may not apply to other articles of the EPTL (see generally Matter of Dwight, 37 Misc 3d 580, 585 [Sur Ct, NY County 2012]). In rejecting that argument, however, we note that several other provisions of the EPTL, including many that operate outside of the context of intestate succession, expressly import the [*3]definition of a nonmarital child set forth in EPTL 4-1.2 to help ascertain parentage of a child. For instance, EPTL 2-1.3 (a) (3)—which involves rules governing testamentary dispositions to adopted children and posthumous children—provides, with respect to nonmarital children, that "[f]or the purposes of [that] paragraph, a nonmarital child . . . is the child of a father if the child is entitled to inherit from such father under section 4-1.2 of this chapter," and that "[t]he provisions of this paragraph shall apply to the wills of persons dying on and after" September 1, 1991 (emphasis added). Additional provisions of the EPTL governing wills also incorporate by reference the definition of a nonmarital child set forth in EPTL 4-1.2 (see e.g. EPTL 3-3.3 [b]; 5-4.5). In other words, the very text of the EPTL itself presupposes that the definition of nonmarital children contained in section 4-1.2 applies in the context of decedents who die with a will. The relevant practice commentaries also express the understanding that EPTL 4-1.2, to the extent it permits a surrogate's court to compel a DNA test, applies without regard to whether a decedent died intestate or not (see generally Margaret Valentine Turano, Prac Commentaries, McKinney's Cons Laws of NY, EPTL 2-1.3, 4-1.2). In short, various EPTL provisions, and the manner in which they are structured and cross-referenced, support the conclusion that the EPTL's grant of power to permit a surrogate's court to compel a DNA test is not limited solely to cases involving intestate succession.
Although EPTL former 4-1.2 (a) (2) (C) did not expressly state that surrogates' courts have the power to compel a DNA test for the purpose of determining a person's parentage, we conclude that they do have the jurisdiction to grant such relief pursuant to that provision based on their unique placement in the constitutional structure of the judiciary of New York State. The New York State Constitution provides, among other things, that "[t]he surrogate's court shall have jurisdiction over all actions and proceedings relating to the . . . administration of estates and actions and proceedings arising thereunder or pertaining thereto" (NY Const art VI, § 12 [d]). It further provides that "[t]he surrogate's court shall exercise such equity jurisdiction as may be provided by law" (NY Const art VI, § 12 [e]). Indeed, echoing the constitutional structure, the SCPA reaffirms that surrogates' courts "shall continue to exercise full and complete general jurisdiction in law and in equity to administer justice in all matters relating to estates and the affairs of decedents" (SCPA 201 [3]), and—to that end—are permitted to "make a full, equitable and complete disposition of the matter by such order or decree as justice requires" (id.). In other words, the grant of equity jurisdiction to surrogates' courts also extends to the shaping of relief by such a court (see Matter of Abraham L., 53 AD2d 669, 670 [2d Dept 1976]; see generally Matter of Raymond v Davis, 248 NY 67, 71-72 [1928]; Deborah S. Kearns, Prac Commentaries, McKinney's Cons Laws of NY, SCPA 201). Consequently, consistent with the fact that EPTL former 4-1.2 (a) (2) (C) allowed for parentage to be established through a genetic marker test, it follows that, in shaping the relief available to petitioner, the Surrogate here has the authority, via her aforementioned equity jurisdiction, to compel the performance of such a test in a case such as this one. Regardless, we also note that "[t]he CPLR . . . appl[ies] in the surrogate's court except where other procedure is provided by this act" (SCPA 102), which extends to permitting a surrogate's court to allow "full disclosure of all matter material and necessary in the prosecution or defense of an action" or claim (CPLR 3101 [a]; see generally SCPA 1809 [1]). We conclude that CPLR 3101 (a), coupled with EPTL former 4-1.2 (a) (2) (C), also provides a surrogate's court with the power to compel a DNA test in the proper case.
Consistent with the above understanding of the ability of a surrogate's court to shape the relief warranted in the proper case, we reject respondents' further contention that the Surrogate here lacked the power to compel a sibling to undergo a DNA test under the circumstances. Although there is no express statutory authority permitting a surrogate's court to compel DNA testing of a sibling, by the same token there is no statutory language expressly prohibiting such compulsory testing (see generally Matter of Sandler, 160 Misc 2d 955, 958 [Sur Ct, NY County 1994]). Indeed, changes made to the relevant statutory scheme support the proposition that, in enacting the applicable version of EPTL 4-1.2, the legislature intended to broaden the scope of permissible persons from whom DNA could be collected to establish parentage of a nonmarital child. Prior to amendments to the statute made in 2010, EPTL former 4-1.2 (a) (2) (D) provided that a nonmarital child could inherit from their father if "a blood genetic marker test had been administered to the father which together with other evidence establishes paternity by clear and convincing evidence." In other words, the statute's terms expressly authorized only DNA testing of blood procured from the putative father during his lifetime (see Matter of Sekanic, 229 AD2d 76, 77-78 [3d Dept 1997]; Matter of Janis, 210 AD2d 101, 101 [1st Dept 1994]). When it amended the statute in 2010, however, the legislature removed the language limiting DNA [*4]testing to material recovered from the putative father during his lifetime, and replaced it with unrestricted language allowing parentage to be established by any genetic marker test (see EPTL former 4-1.2 [a] [2] [C], as amended by L 2010, ch 64, §§ 1-2). In our view, that alteration demonstrated the legislature's intent to broaden the scope of permissible persons from whom DNA could be collected to establish the parentage of a nonmarital child. The legislative history confirms that point, noting that proof of parentage "may be in the form of a genetic marker test administered to the father (or close relative at any time)" (Assembly Mem in Support, Bill Jacket, L 2010, ch 64 at 8 [emphasis added]). Consequently, we conclude that the Surrogate properly determined that the DNA testing authorized by EPTL former 4-1.2 extends to DNA samples from purported siblings to establish the parentage of a nonmarital child, such as petitioner here. Indeed, we note that there have been several cases where courts have granted the application of a movant seeking genetic testing of siblings to ascertain parentage (see Matter of Gaynor, 13 Misc 3d 331, 332-334 [Sur Ct, Nassau County 2006]; see also Matter of Abramaitis, 2011 NY Slip Op 33234[U], *1-2 [Sur Ct, Nassau County 2011]; see generally Sandler, 160 Misc 2d at 956-958). To the extent respondents contend that the Surrogate lacks the power to compel them to undergo DNA testing on the basis that they are nonparties in the underlying probate proceeding and have not placed their genetic condition in issue, that contention is unpreserved for our review (see generally Sky v Catholic Charities of Buffalo, NY, 194 AD3d 1417, 1417-1418 [4th Dept 2021]; Ciesinski v Town of Aurora, 202 AD2d 984, 985 [4th Dept 1994]).
Having concluded that the Surrogate has the authority to compel DNA testing to establish parentage here, we must next consider respondents' additional contention that, under the facts of this case, the Surrogate abused her discretion in granting petitioner the requested relief. We also reject that contention and conclude that, based on the record before us, the Surrogate did not abuse her discretion in granting the limited relief requested by petitioner—i.e., DNA testing of one of respondents for the sole purpose of establishing whether decedent is petitioner's biological father. In making such a determination, courts have considered whether a request for DNA testing in an inheritance case is "practicable and reasonable under the totality of the circumstances" (Matter of Poldrugovaz, 50 AD3d 117, 129 [2d Dept 2008]; see Matter of Betz, 74 AD3d 1459, 1463-1464 [3d Dept 2010]). Factors considered by the courts in making that determination include "(1) whether evidence presented demonstrates a reasonable possibility that the genetic testing will establish a match; (2) the practicability of obtaining the tissue sample for the purpose of conducting the genetic testing, including whether the sample is readily available; (3) whether there is a need to exhume the decedent's body or obtain the sample from a nonparty; (4) whether appropriate safeguards were, or will be, taken to insure the reliability of the genetic material to be tested; and (5) the privacy and religious concerns of the decedent and or [their] family members" (Poldrugovaz, 50 AD3d at 129).
Here, although the Surrogate did not expressly identify the factors on which she relied, we conclude that, in granting petitioner's application for DNA testing, she properly considered the aforementioned factors relevant to that determination. With respect to the first factor, we note that petitioner's submissions amply raised a reasonable possibility that genetic testing of respondents would establish that decedent was petitioner's biological father. Specifically, in addition to her own affidavit setting forth the basis for her allegation that she is decedent's biological daughter, petitioner submitted an affidavit from her mother, who was able to substantiate specific averred facts to establish the strong possibility that decedent is petitioner's biological father—i.e., by affirming that she had a sexual relationship with decedent around the time petitioner was conceived. Additionally, petitioner produced evidence from the online ancestry website to which she submitted her own DNA samples, which also supported her assertions that she is biologically related to decedent. In other words, in support of her application, petitioner did more than simply assert, without corroboration of her self-serving assertions, that decedent was her biological father. Indeed, this is not a case where evidentiary support for such an application is lacking. Here, the Surrogate was careful to grant the relief in question only after determining that, while petitioner's evidence did not, of course, conclusively establish parentage, there is at least a reasonable possibility based on the evidence presented that the requested DNA testing will in fact establish parentage.
With respect to several other of the Poldrugovaz factors—particularly, "the practicability of obtaining [a] sample" and whether there is a need to "obtain the sample from a nonparty" (50 AD3d at 129)—we conclude that there is nothing to suggest that petitioner could obtain a [*5]biological sample from decedent, rendering it necessary to obtain a sample from respondents, the putative biological siblings. There is no evidence that any of decedent's tissue was preserved, and petitioner would not likely succeed in any attempt to exhume his remains for such testing (see generally Matter of Currier [Woodlawn Cemetery], 300 NY 162, 164 [1949]; Yome v Gorman, 242 NY 395, 402-403 [1926]). Additionally, in granting petitioner's application, the Surrogate noted that obtaining a saliva sample from one of respondents would be a simple, noninvasive method of obtaining a DNA sample to establish petitioner's parentage.
We also conclude, contrary to respondents' contention, that the Surrogate properly considered "the privacy . . . concerns of . . . decedent and . . . his family members" when it granted petitioner the requested relief (Poldrugovaz, 50 AD3d at 129). The Surrogate specifically considered respondents' privacy rights, and balanced them against petitioner's interest in ascertaining her parentage. The Surrogate noted that petitioner's other submissions—i.e., the affidavits and results from the online ancestry website—had already lifted the veil of privacy on the subject of whether decedent had an affair with petitioner's mother, resulting in petitioner's birth. Moreover, with respect to respondents' privacy interests, we note that the Surrogate considered the privacy factors relevant to the specific relief sought by petitioner in her application—i.e., compelling a DNA test for the sole purpose of confirming whether decedent was petitioner's biological father.
Contrary to the assertion of respondents, petitioner does not seek broad, unspecified DNA testing of respondents. Rather, she sought the DNA testing of respondents for the sole purposes of identification. We note that there is a meaningful difference between "compell[ing] genetic testing in civil discovery disputes for identity related issues," and seeking "broad unspecified genetic testing" (Rogers-Duell v Ying-Jen Chen, 42 Misc 3d 291, 295, 297 [Sup Ct, Albany County 2013]). Genetic testing of identity only has been described as "ubiquitous," scientifically accepted, and reliable, and is not considered to be extreme or intrusive (id. at 297; see Betz, 74 AD3d at 1463; Poldrugovaz, 50 AD3d at 128-129). In contrast, unspecified genetic testing implicates different privacy concerns due to the risk that it could reveal a "vast amount of personal and private information" ranging from "familial relationships . . . to the potential discovery of genetic diseases, conditions, and predispositions" (Rogers-Duell, 42 Misc 3d at 296). Here, inasmuch as petitioner only requested DNA testing of respondents for purposes of establishing whether decedent was her biological father—i.e., for identity purposes—we conclude that many of respondents' asserted privacy concerns, which they contend were not considered by the Surrogate, simply do not obtain here.
Given that those stated concerns are not implicated by the relief requested by petitioner—and subsequently granted by the Surrogate—we conclude that the Surrogate did not abuse her discretion in determining that respondents' privacy concerns do not outweigh petitioner's interest in ascertaining her true parentage. Nonetheless, we remind the Surrogate that once petitioner has obtained a DNA sample from one of respondents for purposes of determining whether decedent is her biological father, the Surrogate must take the necessary steps of ensuring that respondents' privacy concerns remain protected, and that any court-ordered genetic marker testing does not exceed the scope of relief granted to petitioner.
We reject respondents' further contention that their privacy rights under Civil Rights Law § 79-l precluded the relief granted by the Surrogate here. It is true enough that, generally, "[n]o person shall perform a genetic test on a biological sample taken from an individual without the prior written informed consent of such individual" (Civil Rights Law § 79-l [2] [a]). Nonetheless, such "genetic tests may be performed without the consent of the person who is the subject of the tests pursuant to an order of a court of competent jurisdiction" (§ 79-l [4] [b] [emphasis added]). Inasmuch as we conclude that the Surrogate, in a court of competent jurisdiction, properly ordered respondents to comply with a DNA test to determine petitioner's parentage, we further conclude that the relief is not precluded by Civil Rights Law § 79-l (2) (a). Similarly, although Civil Rights Law § 79-l (3) (a) provides that the "results of any genetic test performed on any person shall be deemed confidential and shall not be disclosed without the written informed consent of the person to whom such genetic test relates," section 79-l (4) (c) provides that, notwithstanding those provisions, test results may be disclosed by "an order of a court of competent jurisdiction." In other words, the protections of Civil Rights Law § 79-l identified by respondents do not warrant reversal where, as here, we conclude that the Surrogate properly exercised her discretion in granting petitioner's application for DNA testing under [*6]EPTL former 4-1.2 (a) (2) (C).
We have reviewed respondents' remaining contentions and conclude that none warrants reversal or modification of the order.
Entered: July 25, 2025
Ann Dillon Flynn
Clerk of the Court